**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**NATALIE S.,**

                **Plaintiff,**

    **v.**                               **Civil Action 2:21-cv-1631**
                                      **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

                **Defendant.**

**OPINION AND ORDER**

Plaintiff, Natalie S., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 6, 7). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her applications for DIB and SSI on July 24, 2019, alleging that she was disabled beginning September 1, 2018. (Tr. 207–13). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on July 22, 2020. (Tr. 32–66). The ALJ denied benefits in a written decision on August 20, 2020. (Tr. 12–31). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Next, Plaintiff filed this action. (Doc. 1). As required, the Commissioner filed the administrative record (Doc. 12), and the parties briefed the case (Docs. 13, 14, 15).

**A.**    **Relevant Medical Evidence:**

The ALJ summarized the medical records as to Plaintiff's physical impairments:

In terms of physical health, the record shows [Plaintiff] was diagnosed with CML in May of 2017 (1F1). [Plaintiff] had presented for a routine eye examination but was found to have bilateral retinal hemorrhages, which lead to further evaluation (1F1, 6F44). [Plaintiff] was hospitalized for approximately two weeks for treatment and testing, which did reveal CML (1F1). However, I note this diagnosis and the subsequent chemotherapy all predate the alleged onset date in this matter by more than one year. Moreover[,] and as discussed above, some of the laboratory tests did not reveal indicators of acute disease, noting for example that the blast cell proportion in her blood was only 0.5 percent in 2017 (1F19). I do note [Plaintiff] experienced significant side effects to the initial medication she was prescribed to treat CML, imatinib (6F48). However, after changing to dasatinib, [Plaintiff] reported a significant reduction in side effects over a year plus period (6F48). While [Plaintiff] experienced a rash as a side effect of dasatinib, this rash resolved rather quickly on that occasion (6F51, 64). Records generally indicate that [Plaintiff] continues to tolerate dasatinib well, being somewhat contradictory with [Plaintiff]'s testimony of serious side effects from the medication (e.g., 15F11).

[Plaintiff]'s presentation at physical status examinations since the alleged onset date also have shown a level of functioning inconsistent with the limitations she presently alleges. I do note that [Plaintiff] presents as obese (e.g., 4F3). I have considered how a high body weight might reasonably cause or exacerbate [Plaintiff]'s alleged fatigue and pain levels. However, many of the aforementioned physical examinations have shown that neither concerns of obesity or CML have manifested in objective signs of acute physical limitation (e.g., 10F). At a January 18, 2020 consultative examination for example, [Plaintiff] displayed ability to lift, carry, and handle light objects, displayed signs of intact ability to manipulate objects with both hands, and was able to walk without any appreciable difficulty (10F4). I do note however, [Plaintiff] did show signs of decreased sensation to light touch on the lateral aspect of the left knee and in the left heel (10F4). However, other than those signs, [Plaintiff]'s presentation was largely unremarkable for signs of serious physical limitation (10F1-5). Elsewhere in the record, examiners have also noted [Plaintiff] has shown no signs of motor dysfunction due to pain or fatigue (e.g., 14F7).

While sympathetic to [Plaintiff]'s cancer diagnosis in 2017, the fatigue associated with resultant chemotherapy, and the apparent side effects to her initial therapeutic medications, I note that much of [Plaintiff]'s subjective allegations regarding ongoing and disabling levels of pain and fatigue are not corroborated by objective findings or signs. The longitudinal record indicates that [Plaintiff] responded well to a change in medication before the alleged onset date, and thereafter has not presented with many signs of truly debilitating physical limitations and or pain levels (6F64, 15F11). Even when considering the reported symptoms of anemia,

[Plaintiff] still has shown residual ability to lift and carry at the light level, to ambulate effectively without use of an assistive device, and as able to perform postural movements like squatting without much difficulty (10F4). Accordingly, I find that [Plaintiff] can still tolerate a reduced range of light exertional activity despite the symptoms of her physical impairments. That said however, I find that [Plaintiff] can only occasionally climb ramps and stairs, and cannot climb ladders, ropes, or scaffolds due to concerns relating to obesity. Due to these same concerns, I find that [Plaintiff] can occasionally stoop, kneel, and crouch, but cannot crawl. [Plaintiff] must avoid the use of moving machinery, commercial driving, and work near unprotected heights, due to reports of fatigue, confusion as a side effect of medication, and as a general precaution against say [Plaintiff] losing her balance or ability to move quickly because of pain.

(Tr. 21–22).

The ALJ summarized the medical records as to Plaintiff's mental health impairments:

In terms of mental health allegations, again the record does not well corroborate many of [Plaintiff]'s subjective allegations. [Plaintiff] reports a significant decrease in emotional health, memory, and concentration after the 2017 diagnosis for CML (14F5). In addition to serious memory loss, [Plaintiff] reports she began experiencing racing thoughts, panic attacks, and social isolation (17F1). Again, while I am sympathetic to the emotional stress of the cancer diagnosis and the changes in her life caused by treatment, the objective evidence in this record does not strongly correlate with the degree of psychological symptoms [Plaintiff] has alleged. At a January 21, 2020 consultative examination, [Plaintiff] presented with very little sign of anxiety or memory issues (11F2-4). [Plaintiff] had no problems understanding and carrying out simple task instructions (11F4). While she made a few errors at measures of memory recall, these errors were not of a degree that indicated marked complications in overall memory skills, per the examiner (11F4). [Plaintiff] displayed signs consistent with adequate concentration and attention span, per average performance at serial seven and serial three subtractions (11F4). [Plaintiff] reported that she still reads, which also suggests greater residual functioning regarding memory and concentration, than otherwise alleged (11F3). Subsequent records also indicate [Plaintiff] babysits for family members, and will watch over her parents' house and dogs as needed (17F42). Such activity suggests some residual ability to manage a daily routine beyond the mere basis required for independent living (17F42). While [Plaintiff] has alleged regular panic attacks since the CML diagnosis, the record does not reflect any inpatient or emergency room episodes due to such symptoms, again highlighting the divide that exists between [Plaintiff]'s subjective allegations and the objective record.

(Tr. 23).

**B.      The ALJ's Decision**

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2023, and has not engaged in substantial gainful activity since September 1, 2018, her alleged onset date of disability.  (Tr. 18).  The ALJ determined that Plaintiff suffered from the severe impairments of obesity, hemolytic anemias, chronic myelocytic leukemia [CML], major depressive disorder, anxiety disorder.  (*Id.*).  Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meets or medically equal a listed impairment.  (*Id.*). The ALJ considered all of the listings in reaching his finding, with specific emphasis on 12.04, 12.06, and 13.06.  (Tr. 18–19).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except with the following additional limitations. [Plaintiff] can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. [Plaintiff] can occasionally stoop, kneel, and crouch, but cannot crawl. [Plaintiff] must avoid the use of moving machinery, commercial driving, and work near unprotected heights. [Plaintiff] can perform simple, routine, and repetitive tasks that can be performed at the specific vocational preparation [SVP] one to two level. The work environment must be free of fast-paced production requirements and involve only routine workplace changes. [Plaintiff] can tolerate superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety of welfare of others.

 (Tr. 21).

The ALJ additionally found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence and other evidence in the record for the reasons explained in this decision."  (*Id.*).

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff is unable to perform her past relevant work as a cook and specialty cook, but could perform the job duties of

4

other unskilled, sedentary exertional, representative occupations such as an address clerk, document preparer or inspector. (Tr. 25–26). He therefore concluded that Plaintiff was not disabled. (Tr. 26).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.     DISCUSSION

Plaintiff alleges several errors: (1) the ALJ failed to properly consider the Listings at step three, (2) the RFC determination is not supported by substantial evidence because the ALJ failed to properly incorporate Plaintiff's fatigue and failed to properly weigh medical opinions; and (3) the appointment of the Commissioner violated the separation of powers. (Docs. 13, 15).

A.     Step Three

Plaintiff alleges that the ALJ erred at step three by failing to find that she met or equaled the requirements of Listing 13.06, 12.04, and 12.06.  (Doc. 13 at 16–18).  Upon review, the Court concludes that Plaintiff's error is meritless.

At step three, the ALJ must compare a claimant's impairments to an enumerated list of medical conditions that the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).  Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 404.1525(c)(3).  Plaintiff's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at step three of the sequential evaluation process. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").  It is insufficient to come close to meeting the conditions of a Listing. *Higgins v. Comm'r of Soc. Sec.*, No. 2:17-CV-1152, 2018 WL 5283940, at *4 (S.D. Ohio Oct. 24, 2018*), report and recommendation adopted*, No. 2:17-CV-1152, 2018 WL 6046319 (S.D. Ohio Nov. 19, 2018) (citing *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989).

It is Plaintiff's burden to provide sufficiently complete and detailed medical evidence to enable the Secretary to determine whether all of a listing's elements are met. *Jones v. Comm'r*, 336 F.3d 469, 474 (6th Cir. 2003); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).  "'Because satisfying the listings yields an automatic determination of disability . . . the evidentiary standards [at step three] . . . are more strenuous than for claims that proceed through the entire five-step evaluation.'" *Bianchetti*, 2018 WL 3873577, at *4 (alterations in original) (quoting *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014)).

Finally, "[b]ecause abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation.'" *Id.* (alteration in original) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(D)).

> 1. *Listing 13.06*

Plaintiff argues that her chronic myelogenous leukemia met Listing 13.06, specifically 13.06B2b. So, she says, the ALJ's determination to the contrary was erroneous. (Doc. 13 at 16).

To satisfy Listing 13.06, Plaintiff must show she satisfies either part A or part B:

A. Acute leukemia (including T–cell lymphoblastic lymphoma). Consider under a disability until at least 24 months from the date of diagnosis or relapse, or at least 12 months from the date of bone marrow or stem cell transplantation, whichever is later. Thereafter, evaluate any residual impairment(s) under the criteria for the affected body system.

OR

B. Chronic myelogenous leukemia, as described in 1 or 2:
>1. Accelerated or blast phase (see 13.00K2b). Consider under a disability until at least 24 months from the date of diagnosis or relapse, or at least 12 months from the date of bone marrow or stem cell transplantation, whichever is later. Thereafter, evaluate any residual impairment(s) under the criteria for the affected body system.

>2. Chronic phase, as described in a or b:
>>a. Consider under a disability until at least 12 months from the date of bone marrow or stem cell transplantation. Thereafter, evaluate any residual impairment(s) under the criteria for the affected body system.
>>b. Progressive disease following initial anticancer therapy.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 13.06.

Here, the ALJ assessed Listing 13.06 and concluded Plaintiff did not satisfy part A or B:

In terms of listing 13.06, section A is not met because the record does not reflect any bone marrow or stem cell transplantation to treat CML, and the laboratory findings in this record did not qualify as "acute" under the listing 13.00. Laboratory findings only ever showed the proportion of blast cells to be 0.5 percent, much lower than the required 10 percent (1F19). For that same reason, Section B(1) is not satisfied. Section B(2) is not met because again, the claimant never required a

bone marrow or stem cell transplant, and has not developed progressive disease following her initial chemotherapy treatment (e.g., 1F36).

(Tr. 18–19).

First, the ALJ concluded that Plaintiff did not meet part A of Listing 13.06 because Plaintiff did not receive a bone marrow or stem cell transplantation, and Plaintiff did not meet the definition of "acute leukemia." (Tr. 18–19 (citing Tr. 310)); *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 13.00K2a. Next, the ALJ determined that Plaintiff did not satisfy Listing 13.06B1 because she is not in "accelerated or blast phase." That is, Plaintiff's proportion of blast cells was not ten percent or greater, and she never received a bone marrow or stem cell transplantation. (Tr. 19 (citing Tr. 310)). Plaintiff does not challenge either of these determinations, rather she focuses her challenge on the ALJ's determination regarding Listing 13.06B2b.

To satisfy Listing 13.06B2 Plaintiff must establish chronic phase by establishing either (a) the date of bone marrow or stem cell transplantation or (b) "[p]rogressive disease following initial anticancer therapy." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 13.06B2a–b. It is undisputed that Plaintiff did not receive a bone marrow or stem cell transplant so 13.06B2a is unsatisfied. That leaves progressive disease under 13.06 B2b. Under Listing 13.00, "[p]rogressive means the cancer becomes more extensive after treatment; that is, there is evidence that your cancer is growing after you have completed at least half of your planned initial anticancer therapy." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §13.00I6. The ALJ concluded that Plaintiff did not meet the definition of progressive. (Tr. 19). The ALJ cites an August 2018 pathology report ordered by Dr. Gallogly which states: "Although there are occasional small, hypolobate megakaryocytes, there is otherwise no overt evidence of chronic or accelerating chronic myeloid leukemia; blasts and basophils are not increased." (Tr. 19 (citing Tr. 327)). Thus, the ALJ has explained why he

8

determined that Plaintiff's cancer did not meet the definition of progressive with citation to the record.

Plaintiff argues that the ALJ was wrong about the progression of her disease because her TKI medication was changed and her Bcr-abl was increasing, "raising a concern that she was losing response to therapy." (Doc. 13 at 16 (citing Tr. 1009)). She also says she was "typed for transplant eligibility. (*Id.* (citing 1016)).

Upon review, the Court concludes that the evidence Plaintiff offers is not enough to show the ALJ's determination is without substantial evidence. First, the record shows that her TKI medications were likely changed due to side effects, not ineffectiveness. (Tr. 1012). Next, Plaintiff says she was losing response to therapy due to increase in Bcr-abl. But the record seems to support the contrary assertion because her increase in Bcr-abl was not a lasting concern, and her Bcr-abl was "downtrending." (Tr. 1012, 1015–16). The record states: "Repeat Bcr-abl after 6 weeks showed increase to 0.248%, raising concern for loss of response to therapy. Repeat BMBx did not show progression to accelerated or chronic phase; Bcr-abl was 0.02%. TKI resistance panel neg, peripheral Bcr-abl downtrending." Further, Plaintiff says she was "typed for transplant eligibility," but she fails to explain how this meets the definition of progressive. The record she cites says she is on her third TKI, her HLA[1] was typed 10/22/19, and she has "no sib typing yet." (Tr. 1016). Still more, the record indicates that a transplant evaluation would be considered while trialing other TKIs, if she was intolerant to nilotinib. (Tr. 557). This seems to indicate that her consideration for a transplant was not imminent. Plaintiff has failed to sufficiently explain how

---

[1] HLA stand for "human leukocyte antigen." HLA "matching is done before a donor stem cell or organ transplant to find out if tissues match between the donor and the person receiving the transplant." National Cancer Institute, *humal leukocyte antigen matching*, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/human-leukocyte-antigen-matching (last vistited August 19, 2022).

these records indicate that she meets the definition of progressive and the records themselves are not entirely clear. Thus, Plaintiff has not shown that her CML is progressive.

In sum, Plaintiff has not satisfied her burden to show that her CML meets Listing 13.06. She provides the Court with few citations to the record and little to no explanation of how the cited records support her contention that the ALJ got it wrong. As such, the ALJ's Listing 13.06 determination is supported, and there is no error.

### 2. *Listings 12.04 and 12.06*

Next, Plaintiff asserts that the ALJ committed reversible error when determining that her mental impairments did not meet or equal Listings 12.04 and 12.06. Listing 12.04 establishes the criteria for depressive, bipolar, and related disorders, and Listing 12.06 establishes the criteria for anxiety and obsessive-compulsive disorders. To satisfy these Listings, Plaintiff must establish: (1) the impairment-specific medical criteria in paragraph A; and (2) the functional limitations criteria in paragraph B or paragraph C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A1. In other words, Plaintiff must show she meets either paragraphs A and B, or paragraphs A and C for Listing 12.04 and 12.06.

Here, the ALJ determined that Plaintiff did not meet the Paragraph B or C criteria for either Listing; accordingly, Plaintiff could not satisfy the Listing requirements for either 12.04 or 12.06. Plaintiff contests the ALJ's evaluation of the paragraph B criteria only. So the Court's evaluation is similarly limited.

When considering whether a Plaintiff meets the paragraph B requirements, the ALJ uses a five-point scale (none, mild, moderate, marked, and extreme) to rate the degree of limitation in four areas of mental functioning:

(1) understand, remember or apply information;
(2) interact with others;

10

    (3) concentrate, persist or maintain pace;
    (4) adapt or manage oneself.

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B). To satisfy paragraph B, the ALJ must

rate Plaintiff as having extreme limitations in one of these four areas or marked limitations in two.

*Id.* at §§ 12.04(B), 12.06(B). Here, the ALJ determined that Plaintiff had only mild or moderate

limitation in the paragraph B criteria, not enough to satisfy the Listing. (Tr. 19).

      Error, says Plaintiff, because she "has at least two marked limitations in the functional

domains." (Doc. 13 at 17). This error is meritless. The ALJ considered the paragraph B criteria

and supported his conclusion with substantial evidence:

> In understanding, remembering or applying information, [Plaintiff] has a mild limitation. Despite the claims of developing serious memory issues after the 2017 cancer diagnosis, mental status examinations have shown [Plaintiff] able to attend to simple instructions, and perform adequately at measures of short- and long-term memory (Tr. 881). Accordingly, I find the record supports only some mild limitations in this domain.
>
> In interacting with others, [Plaintiff] has a moderate limitation. [Plaintiff] reports social anxiety and that she isolates in her home (Tr. 44). However, the record reflects [Plaintiff] has related well with medical providers and staff, maintains a positive relationship with her boyfriend, and babysits for family members, all indicating residual ability to interact appropriately with others (e.g., Tr. 1064). Thus, I find only some moderate limitations in this domain.
>
> With regard to concentrating, persisting or maintaining pace, [Plaintiff] has a moderate limitation. While [Plaintiff] has performed adequately at measures of concentration such as serial seven and serial three subtractions, it is likely she would experience some greater limitation in this domain when in a competitive work setting, compared to a clinical setting (Tr. 881). Thus, I find some moderate limitations in this domain.
>
> As for adapting or managing oneself, [Plaintiff] has experienced a moderate limitation. [Plaintiff] reports she drives and is able to generally meet basic demands of daily living such as personal hygiene tasks and basic cleaning (Tr. 880). However, [Plaintiff] has shown difficulties adjusting emotionally to the diagnosis of CML from 2017, and thus I find some moderate limitations in her ability to adapt and manage herself (Tr. 908).

(Tr. 19 (citations updated to transcript number)).

While Plaintiff's argument is that she had at least two marked limitations, she does not specify in which paragraph B criteria the ALJ should have found a marked limitation.  She simply says the ALJ should have considered that:  "Plaintiff was noted to be struggling with the side effects of her chemotherapy and was concerned that she would need a bone marrow transplant (Tr. 1047), she was struggling just to have a conversation (Tr. 1064), she felt exhausted just trying to get to functioning and not be nervous around people (Tr. 1075), and it was hard to do even everyday things (Tr. 1084)."  (Doc. 13 at 17).

Plaintiff's argument is essentially the ALJ should have considered additional evidence.  Up front, it is important to note that the ALJ does not have to discuss every piece of evidence. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).  Moreover, the ALJ considered many of the difficulties Plaintiff cites.  Plaintiff says she was struggling with the side effects of chemotherapy and was concerned about a bone marrow transplant.  (Doc. 13 at 17 (citing Tr. 1047)).  The ALJ expressly noted Plaintiff's difficulties adjusting emotionally to her CML diagnosis.  (Tr. 19 (citing Tr. 908)).  Plaintiff says she was struggling to have conversation and was nervous to be around people.  (Doc. 13 at 17 (citing Tr. 1064, 1075).  The ALJ considered Plaintiff's reports of social anxiety, but also looked to Plaintiff's ability to relate well with medical providers, positive relationship with her boyfriend, and babysitting for her family, all indicating she has an ability to interact with others in determining her degree of limitation.  (Tr. 19 (citing Tr. 44, 1064).  Finally, Plaintiff says the ALJ should have considered her difficulty doing everyday things.  (Doc. 13 at 17 (citing Tr. 1084)).  But the ALJ considered the medical record and concluded that Plaintiff had the ability to meet the basic demands of daily living.  (Tr. 19 (citing Tr. 880, 908).

In sum, Plaintiff has failed to establish that the ALJ's evaluation lacked substantial evidence. The ALJ evaluated the paragraph B criteria and supported his conclusions with citations to the record. The ALJ's determination that Plaintiff is mild or moderately limited in the four paragraph B criteria is supported by substantial evidence. Plaintiff's argument to the contrary is baseless. Plaintiff wishes "the ALJ had interpreted the evidence differently." *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, No. 2:15-CV-01831, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017). But the law prohibits the Court from reweighing the evidence and substituting its judgment for that of the ALJ. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.").

**B.    RFC**

Next, Plaintiff alleges that the ALJ's RFC does not adequately account for her fatigue and did not properly consider the medical opinions of Dr. Lee and Dr. Gallogly. (Doc. 13 at 11–15, 18–20). Because Plaintiff focuses only on these portions of the RFC analysis, the Court does the same.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 155 (6th Cir. 2009). *See also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R.

§ 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

When determining the RFC, the ALJ is charged with evaluating several factors, including the medical evidence (not limited to medical opinion testimony) and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). The RFC assessment must be based on all the relevant evidence in Plaintiff's case file. 20 C.F.R. § 416.945(a)(1). "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'" *Davis v. Commissioner of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)).

Plaintiff filed her application after May 23, 2017, so it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017). Taken together, the regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[2] 20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5).

---

[2] The regulations define prior administrative findings:

Regarding two of these categories (medical opinions and prior administrative findings), an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability";  (2)  "[c]onsistency";  (3)  "[r]elationship  with  the  claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements."  §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered.  §§ 404.1520c(b)(2); 416.920c(b)(2).  An ALJ may discuss how he or she evaluated the other factors but is not generally required to do so.  *Id*.  Thus, the role of the ALJ is to articulate how they considered medical opinions and how persuasive they found the medical opinions to be.  *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021).

The role of the Court is not to reweigh the evidence, but to ensure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence.  *Id.*, at *14.

---

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

Here, the ALJ determined that Plaintiff had "the residual functional capacity to perform sedentary work." (Tr. 21). The ALJ included additional limitations: " [Plaintiff] can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. [Plaintiff] can occasionally stoop, kneel, and crouch, but cannot crawl. [She] must avoid the use of moving machinery, commercial driving, and work near unprotected heights. [Plaintiff] can perform simple, routine, and repetitive tasks that can be performed at the specific vocational preparation [SVP] one to two level. The work environment must be free of fast-paced production requirements and involve only routine workplace changes. The claimant can tolerate superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety of welfare of others." (*Id.*).

Ultimately, the ALJ determined the RFC based on his evaluation of medial and non-medical evidence. He built "an accurate and logical bridge between the evidence and his conclusion." *Davis v. Commissioner of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)). That is all that is required.

### 1. Fatigue

Plaintiff alleges that the ALJ did not properly consider her fatigue in crafting the RFC. (Doc. 13 at 18–20). Her argument is essentially that if the ALJ considered the evidence she cites, he would have concluded she had a more restrictive RFC. She says with this more restrictive RFC, there are no jobs for her. (*Id.*).

Up front, the Court notes that Plaintiff's characterization of the Vocational Expert's ("VE") hearing testimony regarding fatigue is misleading. Plaintiff says: "When the vocational witness was asked hypothetical questions incorporating her fatigue and her need for additional breaks, it was opined that there were no jobs for such a person." (Doc. 13 at 19). But the VE, when asked a question that would seem to incorporate Plaintiff's fatigue through breaks to sit, said while there would be a reduction in the number of occupations available, there are still jobs in the national economy. (Tr. 60). Plaintiff seems to be conflating the VE's response to the hypothetical based on Plaintiff being off-task with the question considering her fatigue. When asked about how much a person could be off-task, the VE testified that being off-task 10% of the time or greater would be unacceptable in competitive employment. (Tr. 61–62). So Plaintiff has failed to show how a more restrictive RFC would change her determination.

Even so, the ALJ considered medical and non-medical evidence when assessing how Plaintiff's fatigue impacted her RFC. Regarding fatigue and other symptoms, the ALJ said:

> [Plaintiff]'s presentation at physical status examinations since the alleged onset date also have shown a level of functioning inconsistent with the limitations she presently alleges. I do note that [Plaintiff] presents as obese (e.g., Tr. 429). I have considered how a high body weight might reasonably cause or exacerbate [Plaintiff]'s alleged fatigue and pain levels. However, many of the aforementioned physical examinations have shown that neither concerns of obesity or CML have manifested in objective signs of acute physical limitation (e.g., Tr. 868–877). At a January 18, 2020 consultative examination for example, [Plaintiff] displayed ability to lift, carry, and handle light objects, displayed signs of intact ability to manipulate objects with both hands, and was able to walk without any appreciable difficulty (Tr. 871). I do note however, [Plaintiff] did show signs of decreased sensation to light touch on the lateral aspect of the left knee and in the left heel (Tr. 871). However, other than those signs, [Plaintiff]'s presentation was largely unremarkable for signs of serious physical limitation (Tr. 868–872). Elsewhere in the record, examiners have also noted [Plaintiff] has shown no signs of motor dysfunction due to pain or fatigue (e.g., Tr. 910).
>
> While sympathetic to [Plaintiff]'s cancer diagnosis in 2017, the fatigue associated with resultant chemotherapy, and the apparent side effects to her initial therapeutic medications, I note that much of [Plaintiff]'s subjective allegations regarding

17

> ongoing and disabling levels of pain and fatigue are not corroborated by objective findings or signs. The longitudinal record indicates that [Plaintiff] responded well to a change in medication before the alleged onset date, and thereafter has not presented with many signs of truly debilitating physical limitations and or pain levels (Tr. 572, 925). Even when considering the reported symptoms of anemia, [Plaintiff] still has shown residual ability to lift and carry at the light level, to ambulate effectively without use of an assistive device, and as able to perform postural movements like squatting without much difficulty (Tr. 871). Accordingly, I find that [Plaintiff] can still tolerate a reduced range of light exertional activity despite the symptoms of her physical impairments. That said however, I find that [Plaintiff] can only occasionally climb ramps and stairs, and cannot climb ladders, ropes, or scaffolds due to concerns relating to obesity. Due to these same concerns, I find that [Plaintiff] can occasionally stoop, kneel, and crouch, but cannot crawl. [Plaintiff] must avoid the use of moving machinery, commercial driving, and work near unprotected heights, due to reports of fatigue, confusion as a side effect of medication, and as a general precaution against say [Plaintiff] losing her balance or ability to move quickly because of pain.

(Tr. 22).

The ALJ discussed Plaintiff's medical record, including Plaintiff's fatigue. (*Id.*). The ALJ considered how Plaintiff's obesity, cancer, and chemotherapy treatment would impact her fatigue. He considered Plaintiff's subjective complaints regarding ongoing and disabling levels of pain and fatigue but noted they were "not corroborated by objective findings or signs." (*Id.*). These objective findings included that she had responded well to a change in her medication, had no signs of acute physical limitation, had the ability to lift and carry at the light level, ambulate effectively, and perform postural movements. (*Id.* (citing Tr. 572, 910, 925, 868–877)).

In addition to considering Plaintiff's medical record and non-medical evidence, the ALJ analyzed various medical opinions. Specifically relevant to fatigue, the ALJ reviewed Dr. Siddqui's opinion:

> I find little persuasive effect in the opinion of the state agency medical consultant Dr. Mehr Siddiqui M.D., who noted [Plaintiff] could perform a somewhat reduced range of medium work (Tr. 98–99). I find this opinion is inconsistent with the persist[ent] nature of [Plaintiff]'s reported fatigue and pain levels, even if the objective record does not strongly support the full extent of symptoms [Plaintiff] has alleged.

(Tr. 24 (citations updated to transcript number)). The ALJ clearly found that Plaintiff's subjective allegations of fatigue were significant enough to discount the opinion that found Plaintiff could do reduced medium work.

Additionally, the ALJ specifically accounted for Plaintiff's fatigue in crafting a limitation in the RFC. He said: "[Plaintiff] must avoid the use of moving machinery, commercial driving, and work near unprotected heights, due to reports of fatigue, confusion as a side effect of medication, and as a general precaution against say [Plaintiff] losing her balance or ability to move quickly because of pain." (Tr. 22).

Plaintiff argues the ALJ failed to consider her reports of fatigue from the hearing testimony. (Doc. 13 at 18 (citing Tr. 41–55)). This allegation is baseless. The ALJ expressly took Plaintiff's reports of fatigue into consideration when crafting the RFC. (Tr. 22–24). Moreover, while Plaintiff's subjective complaints may support a finding of disability, objective medical evidence still must confirm the severity of the alleged symptoms. *Manning v. Comm'r of Soc. Sec.*, No. 1:18-CV-1246, 2020 WL 1678262, at *4 (W.D. Mich. Feb. 21, 2020), *report and recommendation adopted*, No. 1:18-CV-1246, 2020 WL 1675843 (W.D. Mich. Apr. 6, 2020) (citing *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004)). Here, the ALJ determined that the medical record does not support the severity of Plaintiff's subjective complaints of fatigue. (Tr. 22, 24). Plaintiff fails to explain what medical records support her subjective complaints. (*See* Doc. 13 at 18–19).

In sum, the ALJ considered Plaintiff's subjective reports of fatigue and the medical record. (Tr. 22, 24). Ultimately, he concluded that Plaintiff's reports of fatigue warrant some limitations but are not entirely corroborated by the record. As a result, the ALJ assessed Plaintiff to be capable

of light work with various limitations, including limitations based on fatigue.  This finding is supported by substantial evidence, and there is no error.

### 2.    *Medical Opinions*

Next, Plaintiff says the ALJ did not properly consider the medical opinions of Dr. Lee and Dr. Gallogly.  (Doc. 13 at 11–15).  So, she says, the RFC is not supported by substantial evidence.

<u>*Dr. Lee*</u>:    Plaintiff argues that the ALJ erred because he did not consider Dr. Lee's evaluation as a medical opinion.  (Doc. 13 at 12).  But Plaintiff does not say that Dr. Lee's evaluation is, definitionally, a medical opinion.  (*Id.*).  A medical opinion is "a statement from a medical source about what [Plaintiff] can still do despite [her] impairment . . . ."  20 C.F.R. § 404.1513(a)(2).  This opinion can discuss impairment-related limitations on Plaintiff's ability to perform "physical demands of work activities," "mental demands of work activities," or "other demands of work."  20 C.F.R. § 404.1513(a)(2)(i–iii).

Notably, Plaintiff does not argue that this evaluation makes a statement about what Plaintiff can do.  And, upon independent review, the Court concludes it does not, and thus is not a medical opinion.  Dr. Lee does not say what Plaintiff can or cannot do.  Instead, she makes statements like: "During the present evaluation, objective performance validity measures indicated that non-neurological . . . factors may have interfered with task performance at times."  (Tr. 911).  Or "her history and present results . . . are not indicative of a cognitive disorder."  (Doc. 912).  At best, Dr. Lee makes statements such as Plaintiff's symptoms "may intermittently reduce cognitive effectiveness" but even this does not opine on what Plaintiff can do despite these limitations or how these limitations would affect her ability to work.  Dr. Lee's evaluation, while thorough, does not give a functional analysis regarding Plaintiff's ability to perform the mental, physical, or other

20

demands of work. As such, the ALJ did not err by failing to assess Dr. Lee's evaluation as a medical opinion.

Further, the Court notes that Plaintiff's statement that "the ALJ failed to even mention or discuss this extensive evaluation" is false. (Doc. 13 at 12). The ALJ discussed this evaluation several times throughout the opinion. (Tr. 19 (citing Tr. 908), Tr. 22 (citing Tr. 910), Tr. 23 (citing Tr. 908, 910), Tr. 24 (citing 908)). Dr. Lee's evaluation was considered by the ALJ when assessing the record as a whole.

_Dr. Gallogly_:  Next, Plaintiff argues that the ALJ improperly evaluated the medical opinion of Dr. Molly Gallogly. (Doc. 13 at 13–15). More specifically, she says the ALJ failed to consider various evidence in the record that is consistent with Dr. Gallogly's more restrictive opinion. (_Id._ at 13–14). Thus, she says, the ALJ's conclusion that Dr. Gallogly's opinion was unpersuasive was not supported by substantial evidence. (_Id._ at 14).

The ALJ assessed Dr. Gallogly's opinion:

> I find little persuasive effect in the opinion of Dr. Molly Gallogly who stated in relevant part [Plaintiff] cannot sit, stand, and or walk for eight hours per day, can lift and carry at the sedentary level, would be absent more than four days per month, and is incapable of even low stress work (Tr. 1018–1022). Dr. Gallogly's opinion is not well supported by narrative explanation or by citation to specific evidence to support the inability to sit for more than two hours or the need to be absent more than four times per months. Such findings are largely inconsistent with a treatment record that indicates [Plaintiff]has not experienced acute medicinal side effects since being switched to dasatinib, and are largely inconsistent with the [Plaintiff's] unremarkable presentations at various physical examinations (Tr. 559, 871, 910).

(Tr. 23 (citations updated to transcript number)).

First, the ALJ assessed supportability which is the extent to which the opinion is internally supported. 20 C.F.R. § 404.1520c(c)(1). He said that "Dr. Gallogly's opinion is not well supported by narrative explanation or by citation to specific evidence. . . ." (Tr. 23). Upon review, the Court determines that the ALJ's representation is accurate. There is little explanation accompanying this

restrictive opinion in the form of narration, nor is there citation to evidence Dr. Gallogly relied upon. Importantly, Plaintiff does not seem to contest supportability. Even so, the ALJ discussed supportability when evaluating this opinion and accordingly satisfied the regulations. 20 C.F.R. § 404.1520c(b)(2).

Then the ALJ evaluated the extent to which the opinion is consistent with the record as a whole. 20 C.F.R. § 404.1520c(c)(2). The ALJ found that Dr. Gallogly's opinion that Plaintiff could not "sit for more than two hours" and would "be absent more than four times per month" inconsistent with Plaintiff's lack of side effects from her new medication and her unremarkable presentations at various physical examinations. (Tr. 23 (citing Tr. 559, 871, 910)). Elsewhere in the opinion, the ALJ explained that Plaintiff's side effects resolved when she switched medications (Tr. 22 (citing Tr. 556, 925)), she had no objective signs of acute physical limitation (*id.* (citing Tr. 868–877)), she could lift, carry, and handle light objects, and could walk without appreciable difficulty, and perform postural movements (*id.* (citing Tr. 872, 910)). Thus, the ALJ explained why he determined this restrictive opinion was inconsistent with the record.

Plaintiff's argument, again, is that the ALJ should have considered other evidence in the record that she says supports Dr. Gallogly's opinion. (Doc. 13 at 13–14). Plaintiff points to a list of symptoms, including reports of memory loss (Tr. 590); panic attacks (Tr. 510); tiredness (Tr. 926); and numbness in leg and feet (Tr. 967, 1012). An ALJ does not have to discuss every piece of evidence. *Kornecky*, 167 F. App'x at 508. And yet, the ALJ here considered many of these symptoms. Regarding memory, he said that Plaintiff's "mental status examinations have shown [Plaintiff]able to attend to simple instructions, and perform adequately at measures of short and long term memory." (Tr. 19 (citing Tr. 881), 23). He noted Plaintiff's panic attacks. (Tr. 23 (citing Tr. 1023)). As previously detailed, the ALJ considered Plaintiff's tiredness through his

evaluation of her fatigue. (Tr. 22, 24). And he took into account her reports of numbness and decreased sensation in her left leg. (Tr. 22 (citing Tr. 881)). The ALJ considered much of the evidence Plaintiff says he should have considered.

Thus, the ALJ properly considered supportability and consistency when determining that Dr. Gallogly's opinion was unpersuasive. He supported this evaluation with citations to the record which enabled Court review. There is no error.

*****

The ALJ found Plaintiff to be capable of sedentary work with additional limitations. (Tr. 21). In crafting the RFC, he properly considered medical and non-medical evidence, including Plaintiff's fatigue and various medical opinions. The ALJ's analysis of Plaintiff's RFC allowed the Court to conduct a review of the decision because he built a logical bridge between the evidence and his conclusion. Fundamentally, Plaintiff disagrees with how the ALJ weighed the evidence, but the ALJ is charged with determining a claimant's residual functional capacity and resolving conflicts in the medical evidence. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The law prohibits the Court from reweighing the evidence and substituting its judgment for the ALJ's. *See Reynolds*, 424 F. App'x at 414 (citing *Youghiogheny*, 49 F.3d at 246). Here, the ALJ properly considered the record when determining Plaintiff's RFC, and his ultimate conclusion is supported by substantial evidence.

### C. Separation of Powers

Plaintiff also contends that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security, Andrew Saul, violated the separation of powers doctrine, and therefore, the decision to deny her benefits was made by individuals who lacked a proper delegation of power to make benefits determination. (Doc. 13 at 10–11). This

contention lacks merit.

### 1.    *Plaintiff's Constitutional Claim is Procedurally Improper*

As an initial matter, the claim is procedurally improper.  Plaintiff's Complaint does not include any Constitutional claims.  (Doc. 1).  Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, however, that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Id*.    Here, the United States Supreme Court case upon which Plaintiff bases her Constitutional claim was decided in June 2020.  Yet Plaintiff gave no notice, let alone fair notice, of her Constitutional claim in her April 8, 2021 Complaint.  *See John R. v Comm'r of Soc. Sec*., Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same).  For that reason, she failed to comply with Rule 8.

### 2.    *Plaintiff's Constitutional Claim Lacks Merit*

But even if Plaintiff's Complaint was rule compliant, her Constitutional claim lacks substantive merit.  Removal of the Commissioner is governed by 42 U.S.C. § 902(a)(3) which provides that the Commissioner may only be removed from office "pursuant to a finding by the President of neglect of duty, malfeasance in office."  *Id*.  The parties agree that two recent United States Supreme Court cases cast doubt on the constitutionality of that provision.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme Court held that a provision that allowed the president to remove the Director of the Consumer Financial Protection Bureau ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President.  140 S.Ct. 2183, 2197 (2020).  In *Collins v. Yellin*, decided one year later, the Supreme Court held that a provision limiting the President to removing the Director of the Federal Housing Finance Agency ("FHFA") only for cause similarly violated the separation of powers doctrine.  141 S.Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive").  Plaintiff argues that like the Directors of the CFPB and the FHFA, the Commissioner of Social Security is a single officer at the head of an administrative agency, and therefore, §902(a)(3)'s attempt to impose any restraints on the President's power to remove the Commissioner also violates the separation of powers doctrine.  (Docs. 13 at 10–11 , 15 at 4–8).  The Commissioner agrees. (Doc. 14 at 10) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

Plaintiff further asserts that because this removal provision is unconstitutional, any delegations of power by Former Commissioner Saul, including delegations of authority to ALJs or the Appeals Council who determined her benefits claims, were invalid.  (Doc. 13 at 10–11). The Commissioner contends that Plaintiff's argument fails because the ALJ who determined Plaintiff's claim on August 20, 2020, held office on that date, not because of a delegation of authority from Former Commissioner Saul, but because of a ratification of delegated authority in

July 2018,[3] by Former Acting Commissioner Nancy Berryhill. (Doc. 14 at 12–14). And the Commissioner correctly notes that an Acting Commissioner is not subject to § 902(a)(3)'s removal provision, and therefore that provision's constitutionality, or lack thereof, is irrelevant. *See Collins*, 141 S.Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from the office at the President's discretion.") (emphasis in original).

Nevertheless, Plaintiff asserts that the ALJ and the Appeals Council adjudicated her disability application pursuant to a delegation of authority from Former Director Saul. (Doc. 13 at 11). The Court need not resolve this factual dispute but finds instead that even if Former Director Saul appointed the ALJ and Appeals Council judges who determined Plaintiff's benefits

---

[3] In *Lucia*, the Supreme Court found that the United States Security Exchange Commission (SEC) ALJs were "inferior officers" under the Appointments Clause, U.S. Const. art II, § 2, cl. 2, and therefore, had to be appointed by a President, a court, or the head of an agency instead of lower-level staff. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018). Although *Lucia* involved ALJs at the SEC, on July 16, 2018, Acting Commissioner Berryhill ratified the appointment of the Social Security Administration's ALJ's and administrative appeals judges who were previously appointed by lower-level staff in response to the ruling in *Lucia*. See SSR 19-1p, 84 Fed Reg. 9582, (2019).

claim, the constitutionality of § 902(a)(3) would not warrant remand for several reasons.

First, even if the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived Former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of severability. As the Supreme Court noted in *Seila Law*, "one section of a statute may be repugnant to the Constitution without rendering the whole act void." 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "confronting a constitutional flaw in a statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Id.* (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. Such is the case here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec.*, Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (same).

In addition, even if the removal provision in § 902(a)(3) is unconstitutional, that would not have automatically rendered Former Commissioner Saul's appointment invalid, and thus, it would not have automatically invalidated his actions, including delegating authority to make benefits

determinations or ratifying such delegations.    In *Collins*, the Supreme Court found the unconstitutional removal provision did not render the FHFA's appointments invalid, and thus did not automatically void the FHFA's actions under the Director.    141 S.Ct. 1787 ("Although the statute unconstitutionally limits the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA [that were challenged on appeal] as void.").  Accordingly, infirmities in removal provisions do not automatically void appointments or actions taken by properly appointed officials.  *Alice A. v. Comm'r of Soc. Sec.*, 2021 WL 5514434, *6 (finding that '[t]he infirm *removal* provision does not render Commissioner Saul's *appointment* invalid, which in turn does not render the ALJ's disability determination void.") (emphasis in original); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (finding that the unconstitutional "removal provision does not render the Commissioner's appointment invalid, and thus does not automatically void the SSA's actions under the Commissioner").

Instead, to obtain reversal of an agency decision, a plaintiff must show "compensable harm" flowing from an unconstitutional removal clause.  *Collins*, 141 S.Ct. 1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff occurred due to the President's inability to remove a Director of the FHFA except for cause).  Here, Plaintiff makes no such showing.  Plaintiff asserts that her injuries flow from an illegitimate delegation of power resulting in an invalid adjudication and determination by the ALJ and Appeals Council.  (Docs. 13 at 11, 15 at 4–7).  In so doing, Plaintiff appears to conflate issues that might have presumably flowed from the unconstitutional *appointment* of Former Director Saul with a provision allowing for his unconstitutional *removal*.  As explained above, however, appointments are not nullified by an unconstitutional removal provision.  Nor are actions taken by a properly appointed official.

In short, Plaintiff has not pointed to a connection between any unconstitutional limit on Former Director Saul's removal and the ALJ's determination denying her benefits.  *See also Calcutt v. FDIC*, No. 20-4303, 2022 WL 2081430, at *14–15 (6th Cir. June 10, 2022) (holding that "*Collins* [ ] provides a clear instruction: To invalidate an agency action due to a removal violation, that constitutional infirmity must 'cause harm' to the challenging party[,]" and "vague, generalized allegations" of harm do not demand relief); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) (finding that "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground.").  Nor is it likely that Plaintiff could do so, given that any particular ALJ or Appeals Council decision would not concern the President.  *Cf. Collins*, 141 S.Ct. at 1802 (Kagan, J. concurring) ("The SSA has a single head with for-cause removal protection . . . But . . . I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference.").

For all these reasons, the Undersigned finds that Plaintiff's separation of powers claim lacks merit.  Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.

## III.    CONCLUSION

It is **ORDERED** that Plaintiff's Statement of Errors be **OVERRULED** and that judgment be entered in favor of Defendant.

IT IS SO ORDERED.


Date:   August 23, 2022                              /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE